No. 15,292.

## THE BOARD OF COMMISSIONERS OF ALLEN COUNTY *v.* SIMONS, TRUSTEE, ET AL.

INDIAN LANDS.—*Title in Fee Simple.*—*Taxation.*—Certain lands which by the treaty of 1818 between the United States and the Miami nation of Indians were granted or released to the principal chief of the Miami nation in fee simple, in consideration of the cession by the tribe of certain lands to the United States, are not liable for taxation while the ·owners of the same keep up their tribal relations with the Miami nation. The third article of the ordinance of 1787, relating to the lands and property of Indians, is in force in this State. The language of said clause is broad enough to cover the claims of individual Indians and titles held in fee simple acquired by treaty or otherwise from the United States. *State, ex rel.*, v. *Board, etc.*, 63 Ind. 497, distinguished.

From the Allen Circuit Court.

*R. C. Bell* and *S. L. Morris,* for appellant.

*W. G. Colerick, S. R. Alden, H. Colerick, W. S. Oppenheim, P. A. Randall* and *W. J. Vesey,* for appellees.

COFFEY, C. J.—The central question in this case relates to the right to tax certain lands in Allen county. The cause was tried in the circuit court before a jury, who returned a special verdict.

Among others, the following facts appear by the verdict, viz.: That Jean Baptiste Richardville, prior to the year 1818, and until his death in 1841, was the principal chief of the Miami tribe of Indians. For some time prior to the year 1818 he had, with the consent of his people, and under their law, resided upon and held exclusive possession of the land in controversy, the same being the property of the tribe of which he was principal chief, which included three sections of land, described in the third article of the treaty of 1818 between the United States and the Miami nation of Indians. By that treaty the United States agreed, in consideration of the cession by the tribe of certain

The Board of Commissioners of Allen County *v.* Simons, Trustee, *et al.*

lands to the United States, to grant or release the three sections to Richardville in fee simple. The treaty was signed by Richardville as one of the parties thereto, and, pursuant to its terms, letters patent were issued to him on the 24th day of September, 1823. By another treaty, made on the 6th day of November, 1838, the United States granted to Richardville and his family the privilege of remaining in Indiana when his tribe should remove from the State, and stipulated that he and his family should receive the annuities due them, under the terms of the treaty, at Fort Wayne. In the year 1846 all the Miami nation of Indians, except the family of Richardville, and some other families granted a similar privilege, removed from the State to the then Territory of Kansas. Richardville remained in the undisturbed possession of these three sections of land until his death. By his last will he devised the land to his daughter, La Blonde, or Mary Louise Richardville. The daughter and other descendants of Richardville remained in the possession of the land until the daughter's death, in the year 1847. By her last will she devised the land to her son, Ke-la-ke-wa-ke-ah, *alias* George Aussum, and her daughter, Mon-go-se-quah, *alias* Archange Godfrey.

Both wills were duly probated. Ke-la-ke-wa-ke-ah died and left his portion of the land to his sister, Mon-go-se-quah, and his son, Me-che-ke-no-quah, *alias* William Cass. In the year 1856 Mon-go-se-quah and Me-che-ke-no-quah, by order and judgment of the common pleas court of Allen county had partition of the land between themselves. Before the death of Richardville Mon-go-se-quah intermarried with James R. Godfrey, son of Francis Godfrey, the war chief of the Miamis, who, with his family, was also permitted by the United States to remain in Indiana. Mon-go-se-quah and her husband resided with Richardville on this land, and she and her descendants continued to reside thereon until her death, which occurred in the year 1885. Her husband is still living, and continues to reside on the land. Ke-la-ke-wa-ke-ah

and his son Me-che-ke-no-quah have since the death of La Blonde to the present time been in the possession and occupancy of their portion of the land. There have been born to Mon-go-se-quah and her husband thirteen children, five of whom are still living, and with their families have ever since resided on this land. The families of Godfrey and Me-che-ke-no-quah are among the families mentioned in the treaty of 1854 between the Miami Indians and the United States, and after that treaty, the United States annually took a census of the family and placed upon the list Me-che-ke-no-quah, James Godfrey, Mon-go-se-quah, and all their children and grandchildren, as provided by that treaty, and annually paid to each of them, at Fort Wayne, their portion of the annuities provided for by that treaty, and in the year 1882 paid to them their portion of the amount of the principal sum agreed by the treaty to be paid. They have at all times resided upon and owned the land patented to Richardville, being his descendants. The government of the United States has never consented that they should put off their tribal relations.

By all the treaties made before his death, the United States recognized Richardville as the principal chief of the Miami nation, and as a member of that tribe. He executed, as chief of the Miami nation, the treaty of 1795, and every subsequent treaty with that nation, until the time of his death. The tribe and the whites who came among them treated and recognized him as a Miami Indian and the principal chief of the nation. James M. Godfrey is a Miami Indian, and has always been treated as such by the United States.

All the above-named and their descendants have been treated with by the United States and known as the Miamis of Indiana, and have been so enumerated. The chiefs and head men of the nation in the West, from time to time, called upon them and consulted with the descendants of Richardville whenever any question between them and the

The Board of Commissioners of Allen County v. Simons, Trustee, et al.

United States arose requiring the presence at Washington of representatives of the Miami nation. None of the owners of this land have ever become citizens of the United States or any State therein.

The Miamis of Indiana wear such clothing as is usually worn by the white people in the neighborhood where they reside. Some of them have been married by Catholic priests and some by justices of the peace, under licenses procured from State authority.

In 1886, 1887 and 1888 the children of Me-che-ke-no-quah attended public school, and in 1880 George Godfrey, a son of Mon-go-se-quah, voted at the presidential election. They speak both the Indian and English languages. In her lifetime Mon-go-se-quah caused the lands received from her mother, La Blonde, to be platted into lots, numbered from one to nine, inclusive, but the title and possession of the lots have never been out of the descendants of Richardville since his death.

For the years 1871, 1872, 1873, 1874, 1875, 1876, and 1877, lots one to nine, inclusive, were placed upon the tax duplicate of Allen county, and assessed for State and county purposes, and were duly returned delinquent.

On the 13th day of February, 1878, they were bid in for delinquent taxes by Charles H. Aldrich. The land not having been redeemed, the auditor executed to him a deed. Aldrich conveyed to the appellee in this case, and assigned to him all his rights in the premises.

Aldrich brought suit in the Allen Superior Court, after receiving his deed, to enforce a tax lien against said lands, but after the determination of the case of *Wau-pe-man-qua* v. *Aldrich*, reported in 28 Fed. Rep. 489, holding that the land was not subject to taxation, his suits were dropped from the docket without any final adjudication.

This suit was brought against the board of commissioners of Allen county to recover the amount paid for taxes by

Aldrich under the assumption that the lands above named were not subject to taxation.

It is contended by the appellant that, as these lands were granted and patented to Richardville in fee simple, without any restraint upon alienation, for his own use, and not to any nation or tribe of Indians, or for their benefit, they are subject to taxation as any other lands in the State.

On the other hand, it is contended by the appellee that the Indian title to these lands was never extinguished, and as the owners of the same have kept up their tribal relations with the Miami nation, and have never become citizens of the United States, the lands are within the purview of article. 3, ordinance 1787, and are not, therefore, subject to taxation by the State.

So far as we are informed by the record, no effort was ever made to tax these lands prior to the year 1871. Long acquiescence in the imposition of taxes, unexplained, raises a presumption of a surrender of. the privilege of exemption. *Given* v. *Wright*, 117 U. S. 648. As it does not appear in the special verdict that these lands, prior to that date, had been assessed for taxation, we think it should be assumed, for the purposes of this case, that they had not paid taxes for the support of the ·State and county government up to that time. If, for any reason, they had been legally exempt from taxation between the year 1818 and the year 1871, the burden of showing that something had occurred between those dates which rendered them liable to taxation, rested upon the appellant.

Such reason is not found in any change in our statute upon the subject, for the statutes declaring what lands in the State shall be subject to taxation have remained substantially the same from 1848 to 1881.

It is earnestly contended by the appellant that the ordinance of 1787 is not in force in the State of Indiana, but it has been judicially determined that the third article of that ordi-

The Board of Commissioners of Allen County v. Simons, Trustee, et al.

nance is in force in this State. *Me-shing-go-me-sia* v. *State*, 36 Ind. 310; *Wau-pe-man-qua* v. *Aldrich*, 28 Fed. Rep. 489.

The third article of that ordinance contains this clause : " The utmost good faith shall always be observed toward the Indians; their lands and property shall never be taken from them without their consent ; and in their property, rights, and liberty, they shall never be invaded or disturbed, unless in just and lawful wars authorized by Congress ; but laws founded in justice and humanity shall, from time to time, be made for preventing wrongs being done them, and for preserving peace and friendship with them."

In the month of April, 1816, Congress passed an act which provided that the people of the Indiana Territory might form a Constitution and be admitted into the Union, provided that the same, when formed, should be republican, and not repugnant to the articles of the ordinance of July 13th, 1787, which are declared to be irrevocable between the original States and the people and the States of the Territory northwest of the river Ohio, etc.

On the 10th day of June, 1816, the Territorial Legislature of Indiana enacted the following : " That we do for ourselves and our posterity, agree, determine, declare, and ordain, that we will, and do hereby, accept the propositions of the Congress of the United States, as made and contained in their act of the nineteenth day of April, eighteen hundred and sixteen, etc."

It will thus be seen, as adjudged in the cases above cited, that Indiana made a solemn compact with the United States, by the terms of which certain portions of the ordinance of 1787, among which is the clause above set out, were kept in force. This clause is a provision in favor of the Indian tribes residing on Indiana territory, and, as such, is to be liberally construed in their favor. *Choctaw Nation* v. *United States*, 119 U. S. 1; *United States* v. *Kagama*, 118 U. S. 375 ; *Kansas Indians*, 5 Wall. 737.

It takes no argument to prove that if the State of Indi-

ana can tax these lands, and sell them for the non-payment of such taxes, it may deprive the owners of such lands of their title and use without their consent. This the clause of the ordinance of 1787, above set out, prohibits.

It is claimed, however, by the appellee that this case does not come within the rule laid down in the case of *Me-shing-go-me-sia* v. *State, supra,* for the reasons that it was patented to Richardville in fee simple, without any restraint upon alienation, and for his own use, and not for the benefit of a tribe of Indians.

The cases relied upon by the appellee as sustaining this position, viz., *Taylor* v. *Vandegrift,* 126 Ind. 325, *Lowry* v. *Weaver,* 4 McLean, 82, *Pennock* v. *Commissioners,* 103 U. S. 44, *Langford* v. *Monteith,* 102 U. S. 145, *Pka-o-wah-ash-kum* v. *Sorin,* 8 Fed. Rep. 740, *Hilgers* v. *Quinney,* 51 Wis. 62, *McMahon* v. *Welsh,* 11 Kan. 280, *Commissioners, etc.,* v. *Brackenridge,* 12 Kan. 114, *Southwestern R. R. Co.* v. *Wright,* 116 U. S. 231, are not, in our opinion, in point in this case.

Those bearing upon the question under immediate consideration turn upon the construction of particular treaties and statutes, but none of them bear upon the construction to be placed upon the ordinance of 1787.

There is nothing in the language used in the clause here involved limiting it in the manner contended for by the appellee. The language is broad enough to cover the claim of individual Indians and titles held in fee simple acquired by treaty or otherwise from the United States. We are unable to discover any substantial reason for depriving an Indian of his land without his consent where he owns a fee simple title, when he would be permitted to hold it if his title were less than a fee.

The question as to whether these lands were subject to taxation by the State does not, we think, depend so much upon the question as to whether the owners hold the fee, or a less estate, as it does upon the question of their tribal relations. That the owners of this land constitute a part of

The Board of Commissioners of Allen County v. Simons, Trustee, et al.

the Miami nation, and have kept up their tribal relations, is. abundantly shown by the special verdict before us. They are not citizens of the United States, and, indeed, could not rid themselves of their allegiance to their nation and become citizens without the consent of the United States. *Elk* v. *Wilkins*, 112 U. S. 94.

At the time the lands were granted to Richardville he was the principal chief of the Miami nation. It has been held by this court that the lands granted to Me-shing-go-me-sia, an inferior chief, were not subject to taxation by the State. It is not reasonable to presume that it was the intention of Richardville and of the government to place his lands where they could be taken without his consent, while all the other lands reserved to the Miamis were placed beyond the reach of the State.

In our opinion the lands described in the complaint in this case were not subject to taxation for State and county purposes during the period for which they were assessed. What the status of this land is now we are not called upon to decide.

We are not unmindful that the conclusion here reached is in seeming conflict with the case of *State, ex rel.,* v. *Board, etc.,* 63 Ind. 497. That was an action by the State, on the relation of Godfrey, to compel the board of commissioners of Miami county, by writ of *mandamus,* to refund certain taxes alleged to have been illegally assessed and collected. It was held that *mandamus* was not the proper remedy. It was also held that the complaint was bad, for the further reason that it did not allege that the land upon which the tax had been assessed was reserved to the Indians as a band, and not to them individually ; but the question of the effect of the ordinance of 1787 upon the lands assessed was not decided, and, so far as we know, was not considered. However, the question as to whether these lands are exempt from taxation under the treaties and laws of the United States is a Federal question, and it was expressly held in the case of

*Wau-pe-man-qua* v. *Aldrich, supra,* that they are not subject to taxation, and that the particular tax involved in this suit was void. The reasoning in that case seems to us to be sound, and we know of no reason why we should hold the opinion rendered by the Federal court erroneous.

Judgment affirmed.

McBRIDE, J., took no part in the decision of this case.

Filed Sept. 22, 1891.