J. J. MAYOU MANUFACTURING COMPANY, a Corporation, Plaintiff and Respondent,

vs.

CONSUMERS OIL AND REFINING COMPANY, a Corporation, Defendant and Appellant.

(No. 2266; Mar. 7, 1944; 146 P. 2d 738)

76

78

*Vincent Mulvaney,* of Casper, and *James T. McGuckin,* of Sundance, for plaintiff and respondent.

*Raymond and Guthrie,* of Newcastle, for defendant and appellant.

## OPINION

BLUME, Justice.

This is an action for damages brought by J. J. Mayou Manufacturing Company, as plaintiff, against the Consumers Oil and Refining Company, defendant. At the close of the testimony adduced by the plaintiff and again after all the evidence in the case had been introduced the defendant made a motion for a directed

verdict which was overruled, and the jury impaneled in the case brought in a verdict against the defendant and assessed the damages of plaintiff in the sum of $28,003.50. Thereupon, defendant filed a motion for judgment notwithstanding the verdict. That motion, too, was overruled and judgment was entered in favor of the plaintiff in accordance with the verdict of the jury, and from that judgment so entered the defendant has appealed to this Court. The parties will be referred to herein as in the Court below.

On May 30, 1941, plaintiff owned and operated a Bentonite Plant at Newcastle, Wyoming. The plant consisted of a building about 105 feet long, 75 feet wide and 45 feet high at its highest point, in which were housed all the machinery, equipment, power plant and other apparatus for the processing of Bentonite. The building was constructed of lumber and corrugated iron. The floor under the fuel tank and most of the the drier was of cement, the remainder of lumber. In the refining and milling of Bentonite it is necessary to eliminate the moisture and for this purpose the plaintiff used a revolving drier, circular in shape, about 40 feet long and 42 inches in diameter. The Bentonite was fed into one end and at the other end was a fire burner and chamber. Fuel oil was used for the purpose of heating the drier. This oil was stored in, what is called in the record, a fuel tank with a capacity of 1000 gallons. This tank was located in the building supported by steel supports, set in concrete. It was about 4 feet higher than the drier and one-half of it extending over one end of the drier. The oil was fed to the drier by a gravity pipe line extending, with elbows in it, from the tank to the drier. The oil was atomized with air from a boiler located below the burner, forcing the oil into the furnace which was inside the drier where the oil was ignited. Fuel oil

was delivered into the fuel tank from the outside of the building through a pipe 2 inches in diameter, extending from the top of the fuel tank to the outside so that a truck loaded with fuel oil could back up against the building, hook a hose onto the pipe and by a pump force the oil through the hose and pipe and thus into the fuel tank. A valve in the pipe was located about 3 feet from the top, which, when shut off, prevented oil from entering the fuel tank.

On May 29, 1941, the plaintiff ordered 15 barrels of fuel oil from the defendant. The oil was delivered the following day about noon by one Millhouse, an employee of the defendant. He backed his truck up against the building, hooked the hose of the truck to the supply line leading to the fuel tank of the plaintiff, turned on a pump by reason of which the fuel oil from the truck was forced into the fuel tank. He forced such an amount of fuel oil into the fuel tank that, as shown by some of the witnesses, it overran, the fuel oil spilling onto the drier. Instantly a fire spread throughout the building and within the course of about a half hour destroyed the plant of the plaintiff. In its amended petition, plaintiff pleaded the delivery of the oil by Millhouse without notifying the plaintiff; that while such delivery was being made Millhouse came into the plant to get an invoice of the oil receipted, stating that he did not know how much oil he had on his truck; that he was cautioned not to run the fuel tank over; that Millhouse then was starting to check the amount of oil in

the fuel tank. At that moment the fire occurred. The plaintiff charged that the destruction of the plant and the damage to the plaintiff was proximately caused by the negligence and gross carelessness of the defendant in the following particulars, to-wit:

"The failure of the defendant to notify plantiff before it commenced to unload the fuel oil and resi-

due from the tank truck of the defendant into the pipe line and drier tank of plaintiff's plant, causing said drier tank to overflow and become ignited by coming in contact with the heat and flame from the drier, totally demolishing and destroying said building and its entire contents;

"The furnishing to plaintiff by defendant of fuel oil or residue having a lower flashing point and containing more gas content than is safe to use and commonly sold in the trade for fuel purposes, so that it flashed and caught fire, destroying and demolishing said building of plaintiff and the entire contents thereof;

"The failure of the defendant to know the exact amount of fuel that was being unloaded from defendant's truck to the plant of plaintiff and placing in the tank supplying the drier with more fuel oil than was ordered by plaintiff and in excess of the capacity of said tank at the time, causing said tank to overflow and the escaping oil to catch on fire and destroy the property of plaintiff, as hereinabove set forth;

"The carelessness and negligence of defendant in overflowing the tank supplying said drier with fuel so that fuel oil escaped from said tank, came in contact with the heat and flame from the drier, caught on fire and destroyed the property of plainttiff as hereinabove set forth; wholly without any fault on the part of plaintiff."

The defendant in its answer admitted the corporate capacity of both plaintiff and defendant, generally denied the allegations of the amended petition, stated that the plant was in the exclusive control of the plaintiff, and then alleged in paragraph 4 of the Answer, as follows:

"This defendant further states that on the 29th day of May, 1941, the plaintiff herein directed this defendant to deliver to its manufacturing establishment, the next morning, fifteen barrels of fuel oil. That no special directions for the delivery were made. That this defendant had been supplying the plaintiff with fuel oil, upon its order, for some time previous to

the said date and that the plaintiff knew the manner in which said oil was delivered, the method of delivering the said oil, furnished all the appliances and receptacles for delivering and receiving the said oil except the tank and hose connected therewith used by the defendant for conveying the said oil to the plaintiff for receiving the said oil. That it was no part of the duties of the defendant to consult with the plaintiff regarding the said delivery or to do anything except to deliver the oil ordered and to get a receipt for the same. That the delivery of the said fuel oil to the plaintiff on the said 30th day of May, 1941, was made in the same manner and with the same appliances it had always used for said purpose. That during or after said delivery the plaintiff receipted for said oil, received the same without protest and in the same manner that the oil had been previously received in former deliveries."

Defendant further alleged that the plaintiff was guilty of contributory negligence in this, namely: "That the plaintiff so constructed and placed the fuel tank owned by it and from which the oil therein contained was delivered to the fire in or near the drier described in plaintiff's amended petition that a leak in the said tank would permit the oil therein contained to drop upon the fire or near thereto and become ignited. That further the plaintiff wholly neglected and failed to safeguard the said tank and its contents from said fire box or furnace and wholly failed to properly measure and determine the amount of fuel oil that the said tank would contain, if the said fire was caused by an overflow of oil as stated in said petition, and negligently and carelessly neglected to inform this defendant of the correct amount to be delivered to it." Defendant further pleaded that the person delivering the oil to plaintiff did not in any manner attempt to determine the amount of oil in the fuel tank and had nothing to do with the fuel oil after it left the truck of the defendant.

Plaintiff in its reply denied generally the affirmative allegations of the defendant, including contributory negligence, and in reply to paragraph 4 of the defendant's answer pleaded that: "It had been customary and the regular, safe and necessary practice of the defendant to have the driver of defendant's truck, from which deliveries of fuel oil were made to plaintiff's plant, to check jointly with one of the plaintiff's men, the tank in which said fuel oil was to be delivered, measuring said tank * * * ; that said procedure was always required by plaintiff" for various reasons set forth; that defendant knew that it was dealing with a dangerous material and owed plaintiff a commensurate duty; that defendant did not use ordinary prudence, especially in view of the fact that the driver did not know the amount of fuel oil he had on his truck when he delivered fuel oil to plaintiff on May 30, 1941.

Counsel for the defendant argue that the verdict and judgment are not sustained by substantial testimony, and that hence the motions made by defendant should have been sustained. No question is raised, however, as to the amount of damages if the plaintiff is entitled to recover herein. We shall not undertake to answer all the arguments advanced by appellant, or all the conclusions drawn by its counsel. We must content ourselves by considering the main points raised herein.

I. CONSTRUCTION OF PLEADINGS.

It has been necessary to set out the pleadings of the parties to the extent set out above for the reason that it is in the first place contended, at considerable length, that that part of the reply in which the plaintiff pleads that it was the customary, regular, safe and necessary practice for the driver to check the amount of oil in the fuel tank with one of plaintiff's men, "completely

changes the issues, and is in fact, an admission of negligence of maintaining a dangerous condition in its plant and a plea of avoidance by setting up a custom, contract or understanding" about checking the fuel oil in the fuel tank; that there could have been no possible reason for setting up such practice, except only because of realizing the hazard which it had created and the negligent manner in which it kept its plant. It is further argued that no such custom was proved, and that hence a verdict should have been directed in favor of the defendant. The point is so strongly insisted on throughout the brief as to give the impression that it is one of the main points upon which the claim of the right of a reversal herein is based. We are fully aware of the legal talent of the senior counsel for the defendant herein and have, therefore, given the point the most searching consideration, but we have been unable to draw the same conclusions drawn by counsel or to see the force of the contention. The pleading in the reply was not at all in answer to the plea of contributory negligence contained in the answer. Such contributory negligence was denied in the reply and to ask us to change a specific denial into an admission is a little too much. The pleading mentioned states specifically that it is in reply to paragraph 4 of the defendant's answer, in which the defendant had affirmatively pleaded that "it was no part of the duties of the defendant to consult with the plaintiff regarding the said delivery," etc. Plaintiff apparently wanted to dispute that. The reply did not in any manner touch the allegation in the plaintiff's amended petition that the defendant negligently delivered fuel oil of a lower flashing point and containing more gasoline content than was safe. Nor do we think that it modified or took the place of the allegation in the amended petition to the effect that the defendant negligently caused the fuel tank to overflow. These allegations were prov-

en by testimony other than that relating to the practice mentioned. No objection was made to that testimony, and we could hardly be asked, in view of that, to construe the reply of plaintiff as limiting the negligence of overflowing the fuel tank to the fact that the practice mentioned was not followed. We could scarcely, under the circumstances, construe the amended petition as containing only a general, and the reply as containing a specific allegation of negligence (see 45 C. J. 1136-1137), for the allegations in the amended petition are more or less specific. In fact no such claim is made herein. We think that we could at most construe the pleading in the reply in controversy, if not limited to a denial of paragraph 4 of defendant's answer, as an attempt, perhaps, to allege an act of negligence in addition to those alleged in the amended petition. That the allegation was not supported by proof, as claimed by counsel, would not be fatal in this case, for plaintiff could rely upon any of the acts of omission which were sustained by the proof. 45 C. J. 1127. We might add that the pleading in the reply here in controversy is not confined to a "customary" practice, as counsel seem to argue. The pleading also alleges that it was a "safe and necessary practice." That it would have been a safe practice for the driver to have checked the oil along with one of plaintiff's men, can hardly be doubted, so that that portion of the reply may be said to have been clearly proven. Whether it was necessary or not is another matter. It may be that when plaintiff ordered 15 barrels of oil, the defendant would have performed its duty in so far as the mere delivery was concerned, when and if it put that amount of oil into plaintiff's fuel tank. But, of course, to negligently deliver fuel oil of a greater quantity than ordered which overflowed the fuel tank and with a flash point and gasoline content which was dangerous, is another matter.

II. Negligence of Defendant.

The fuel tank of plaintiff had a capacity of 1000 gallons of fuel oil, or about 24 barrels, each barrel containing 42 gallons. Plaintiff ordered 15 barrels and no more. When Millhouse came to plaintiff's plant to deliver the oil he, without notifying plaintiff, hooked the hose attached to his truck to the supply pipe leading into the fuel tank, releasing the oil in the tank on his truck, started the pump on his truck which pumped the oil into plaintiff's fuel tank, left and went into the building to have the bill of lading receipted, and almost immediately thereafter the fire occurred which destroyed plaintiff's plant. These facts are undisputed. There was fire in the drier at that time, with a heat therein, according to the testimony of Mayou, of 400° to 600°, and of several thousand degrees according to another witness. Some heat was irradiated to the outside, the degrees of which do not appear, except that men could work around the drier notwithstanding the heat. According to the witnesses, Jay, Carter, Rogers and Brown, the fuel tank at that time would have safely held quite a little more fuel oil than the 15 barrels which were ordered. There was no open fire in the building when Millhouse came to deliver the oil. There was fire in the drier, but that was completely covered, and was encased in steel, lined by bricks. Smudge pots were occasionally used to cause a freer flow of the oil in the gravity line, but these were not used at that time. The witness, Jay, testified that Millhouse, when he came to the building, admitted that he did not know how much oil he had in his tank on his truck; that he, Millhouse, was warned not to run the fuel tank over. According to the witnesses, Groner and Rogers, the fuel oil issued spoutingly from the gauging-hole, two or three feet high, over-flowing the fuel tank, running onto the

drier, coming in contact with the heat irradiated therefrom, and almost instantly causing and spreading the fire throughout the building. This was shortly after Millhouse had come into the building. Millhouse testified that he had only 15 barrels of fuel oil in the tank on his truck, but the jury evidently did not believe him, but believed the testimony of the witnesses for the plaintiff. The jury were justified, of course, in view of the foregoing testimony, in finding that Millhouse, letting the pump run at will, without knowing how much oil he had on his truck, and knowing that only 15 barrels had been ordered, did not use ordinary care. That much is true, even if the oil had merely run over without causing the fire, but merely causing a "mess." The fire occurred almost instantaneously when the oil ran over and onto the drier. That is explained by the testimony of the State Chemist who testified that fuel oil with a flash point under 150° is not used safely. A sample of the oil delivered by Millhouse was examined by him and he found it to have a flash point of 96°. The testimony, accordingly, shows that the jury were clearly justified in finding that the fire was caused by reason of the negligent acts of Millhouse in permitting the fuel tank to overflow.

Counsel for the defendant assert that the defendant delivered to plaintiff the fuel oil which had been ordered by the latter and who accordingly cannot complain. We think, however, that the jury were justified in finding contrary to this assertion. In order to make that clear we shall refer to the main points in the testimony in that connection. The witness Culver testified on behalf of the defendant that prior to July, 1940, the defendant sold to the plaintiff and to the trade generally from its tank No. 1 what is called top crude oil, or topping oil, which contains gasoline; that defendant built and operated a cracking plant since the

last mentioned date; that by the cracking process approximately 45% of gasoline and 8% to 10% distillate and other products would be removed; that after that time defendant sold and delivered to the plaintiff the product from tank No. 2, which was a product after the top crude oil had been cracked,—further distilled, the gasoline contents then having been removed; that about thirty days before the fire, Jay, the superintendent of plaintiff, and Mayou, its president, complained to him about the quality of the fuel oil which they received, stating that they could not use it and wanted the defendant to deliver the top crude oil; that he reluctantly consented and thereafter directed fuel oil from tank No. 1 to be delivered to the plaintiff. Mr. Mayou testified as to that conversation, stating, "I told him that the fuel oil we were getting at that particular time was too full of sediment to properly handle it in our burner and I asked for the former grade of fuel that we had." "Q. Was that all you said about the fuel? A. Yes sir." He further testified that Mr. Culver stated that all he could do would be to deliver the product as it came from the topping plant and that this was satisfactory. Perry Jay, an oil expert and superintendent of the plaintiff for about two months previous to May 30, 1941, and who was present at the conversation above mentioned, stated that "the oil that we were getting had too much coke and carbon in it and we wanted to try and get the same oil which we had previously gotten, which was still bottoms or fuel oil." "Q. Still bottoms oil and topping oil is different oils—is there a difference between what you call 'still bottom oil' and the term 'top crude oil'? A. Not any material difference. Still bottom is simply the oil taken off the still after the gasoline, kerosene and distillate have been removed. Q. Mr. Mayou testified that you wanted the topping oil, the top oil? Is that

wrong? Isn't that what you called for? A. Still bottom oil is a topping oil." He further testified that still bottoms or topping oil is oil, after the gasoline, kerosene and distillate have been removed, and is the oil which is sold in the trade as fuel oil; that nevertheless ,while no gasoline or distillate as such remains in the topping oil, by the application of intense heat, called a cracking process, which breaks up the molecules, gasoline and distillates can thereby be produced and removed by that process; that all they asked for was topping oil which was satisfactory; that a different oil was thereafter delivered, which was darker than the regular still bottoms oil, but that he did not analysize it, supposing that the defendant "took a check on their oli." The witness had previously testified as follows: "Q. As a matter of fact, there are less volatile elements in fuel oil from the cracking plant than there is from a topping plant? A. No. Q. Now will you say whether or not there is a difference in gasoline centent and distillate content in a fuel from a cracking plant and one from a topping plant? A. It all depends on how it is made. Q. They can get as much of the lighter contents such as gasoline and distillate out of a topping plant as they can out of a cracking plant? A. It is possible." We might incidentally mention in this connection that the witness Nice, an oil expert, who testified for defendant, agreed that no gasoline was left in a topping oil, but, if we understand him, his theory is that the gasoline is formed by the cracking process by means of intense heat. There does not seem to be a great difference, if any at all, in the testimony as to the conversation itself regarding the nature or quality of the oil to be supplied to the plaintiff in the future. Whether they all understood the conversation in the same way is another matter. Mr. Culver doubtless wanted to tell the jury

that the oil in tank No. 1, which he called topping oil, contained 45% of gasoline and 8% to 10% of distillate; that it contained the same quality of oil which had been sold to the plaintiff and to the trade generally before the defendant installed its cracking plant. But it seems also to be clear that Mayou and Perry Jay meant to tell the jury that what they asked for was fuel oil with the gasoline content, at least the dangerous part thereof, removed. It was the jury's function to settle whatever conflict seemed to arise out of the testimony. We are confronted with several aspects of the case at this point. It is clear that the plaintiff wanted the same quality of oil which it had received previously. If the oil then contained in tank No. 1 was of a different quality of oil than had been contained therein prior to the installation of the cracking plant, then it would seem that Mr. Culver should have informed Mayou and Jay of that fact. But he did not do so. He hesitated to give them that oil, but only because it was more valuable to the defendant to have it go through the cracking process. He did not intimate, so far as the record shows, that it was of a more dangerous quality than had been the oil in that tank prior to the installation of the cracking plant. Perry Jay testified, it is true, that the oil actually delivered was darker than regular still bottoms oil, but that he supposed that defendant had checked the oil, and that the color did not necessarily have anything to do with the composition of the oil. In view of the fact that there was nothing to indicate any danger to him, we hardly think that he was negligent, at least as a matter of law, as counsel for defendant seem to think, in not objecting to the oil received. Again, considering the testimony from another aspect, it would seem that the jury were justified in finding that the oil from tank No. 1 was not in fact any different from the oil contained in that tank

prior to the installation of the cracking plant. The defendant's witness Nice, and the witness Jay, testified that topping oil did not contain gasoline, at least in any dangerous quantity and that the cracking process "makes" gasoline. The fuel oil delivered on the day of the fire was dangerous according to the testimony of the State Chemist. Is it likely that the defendant would for a number of years furnish such dangerous oil to the trade generally as well as to the plaintiff especially when defendant knew, as it did, the construction of plaintiff's plant? And another aspect. Millhouse testified that the oil which he furnished to plaintiff two weeks before the fire came from tank No. 1, namely, topping oil. He overflowed the fuel tank of plaintiff at that time. Plaintiff's testimony,—denied, it is true, by Millhouse—shows that the drier was then in operation. — "had been running pretty steady" — just as it was in operation on May 30, 1941, but nothing happened. The only effect of the overflow was to create a "mess" on the floor. Assuming plaintiff's testimony to be true, as the jury had a right to do, the incident would be likely to give the impression that it proved, and the jury probably thought conclusively, that the oil delivered on May 30, 1941, did not come from tank No. 1, but came from another tank (defendant had 42 tanks) which contained oil with a dangerous content of gasoline. And still another aspect of the case is presented. Assuming Mr. Culver's testimony as to the oil in tank No. 2 to be true there is no evidence that the use of it would have been dangerous by going in a pipe directly from the plaintiff's fuel tank to the drier,—in other words, if the fuel tank had not overflowed. It proved to be dangerous when that tank overflowed. And if that was due to the negligence of Millhouse, as the jury had the right to find, then that negligence of Millhouse was the cause

of the fire. Any view, accordingly, which we may take of the testimony, would seem to lead to the conclusion that the jury were justified in finding for plaintiff, unless the latter was guilty of contributory negligence.

### III. CONTRIBUTORY NEGLIGENCE. Exposure of premises to negligence of another.

Various arguments are advanced by defendant to show that the plaintiff was guilty of such negligence. Much stress is laid upon the claim that the fuel tank was leaky. We are not at all certain that it is of any importance herein. The burden of showing contributory negligence, contributing to the fire, was on the defendant and in so far as the record indicates the mere fact that the tank might have been leaky is not shown to have been the cause of the fire, or that it had anything to do with it. At least the jury had the right to take that view of the case, inasmuch as they had the right to find that the fire was started when the tank overflowed by reason of the negligence of Millhouse. However, since counsel for defendant argue the point at great length, we shall consider it to some extent. Counsel insist that the tank was running over repeatedly; that is based on the testimony of the witness Rogers. His testimony is as follows: "Q. As a matter of fact, didn't you have this in mind, too—you wanted to determine whether or not the tank would overflow if too much was put in, isn't that true? A. Yes, I guess so. Q. You guess that is true. Why didn't you want the tank to overflow? A. It always made a mess on the floor and I didn't want to clean it up. Q. How about getting it on the drier, which was red hot? A. Not if it was the right kind of oil, it would not burn. Q. How do you know that? A. It has been run over before. Q. That tank has been run over a

number of times before? A. I don't know as to the number of times, but I know it has been run over. Q. That was done by putting oil in the tank? A. Yes, overflowing it. Q. And was the drier running at the time it run over before? A. Yes. Q. Every time, or just one time? How many times do you know of its running over? A. As many times as I know, it was always running." The testimony was elicited on cross-examination and it was not elucidated further, probably on account of the nature of the further cross-examination, which it is not necessary to set out herein. The phrase, "it was always running," is not altogether clear, nor does it show that the tank was leaky. The witness testified about the fuel tank "running over," and about the drier "running." He clearly distinguished between "running over" and "running," and it is not likely that he lost sight of this distinction. He did not say in the last sentence above quoted that "it was running" *over*, as counsel for defendant construe that sentence. Considering the testimony as a whole, the witness, bearing in mind the distinction above mentioned, probably meant that the drier was running, whenever the tank ran over. That makes his testimony consistent. The construction which counsel for defendant put upon it, makes it inconsistent. In any event, if the witness meant that the tank had overflowed more than once it is inconsistent with the testimony of the witness Carter who stated that the tank had overflowed once before. In view of this state of the record, it was a question for the jury as to the number of times that the tank had overflowed. The witness Jay testified, as already shown, that he warned Millhouse not to let the tank run over. Counsel say that this is significant, and that it shows conclusively that the tank overflowed repeatedly. We are unable to see the conclusive effect seen by counsel.

The "mess" caused by Millhouse two weeks previously probably was sufficient cause for Jay to make the statement. No one likes to clean up a "mess" even once.

Attention is also called to the testimony of the witness Bozanich, who last delivered oil to the plaintiff about May 14, 1941, and whose testimony was in part, as follows: "Q. Tell the jury just exactly what you saw with reference to any leaks around that tank or pipe. A. Well, there is a kind of union there like and there was a valve, and it would squirt out as you pumped into it—that valve was on the line that I was pumping fuel in * * there was a kind of puddle like; in fact it kind of run over there once." On cross-examination appears the following: "There was bad joints in the (pipe) line. Q. When was it that you saw the line leaking? A. This here was before and after when I saw these lines leaking. Q. Just where in the line was it? A. It was where you were unloading and it went into the tank—that open place in the top where it went in. Q. So it wasn't in the pipe line leading to the tank? A. It was in the pipe line and sometimes it' kind of slopped over the top a little * * * it was kind of dripping over the top. Q. And you weren't at all alarmed at that with the drier operating? A. No. Q. You didn't consider it was a fire hazard? A. I figured it was a fire trap. Q. So you stayed close to it? A. I had seen some smudge pots around there, and fire around there." The testimony is not very clear to us, and we are unable to judge of the weight of it. The witness appears to have referred in part at least to the pipe line outside of the building leading to the fuel tank. To that extent his testimony would not be important. He seems to make reference, in part, to a leak on the top where the pipe line went into the fuel tank. No one else seems to have noticed any de-

fects in the pipe line. The witness Mayou testified, as already stated, that the plant was in perfect condition. Again if the witness meant that there was a leak at the point where the outside pipe lead into the fuel tank, as it seems he did, then he was contradicted by the witnesses Groner, Rogers and Mayou who testified that the pipe was fastened solidly into the fuel tank. Counsel for defendant call our attention to the hole as it appeared after the fire. But the witness Thatcher testified that "before it was damaged, the hole was perfectly round and the pipe set in that * * evidently when the tank collapsed, this hole was torn so that it made an irregular hole." We are not satisfied that the leaks testified to by the witness Bozanich presented any dangerous situation. In any event, the effect of the testimony and the credibility of the witness were, we think, for the jury.

That leaves for consideration the construction of the plant in general, particularly the relative position of the drier and the fuel tank, the latter being directly over the drier, and also the gauging-hole on top of the fuel tank which seems to have been open. And counsel for defendant contend that plaintiff was guilty of contributory negligence in having a plant which was constructed in that manner. The witnesses Mendenhall, Varner, Landrigan and Nice testified that the plant was a fire trap and the construction inherently dangerous. The witness Amberson, a graduate of a school of mines, specializing in metalurgy and chemistry, testified that there was nothing inherently dangerous in plaintiff's equipment, though he stated that if the fuel tank were leaky, it would not be safe. The witness Eyrick, manager of a Bentonite plant, a graduate of an engineering school, and thoroughly acquainted with plaintiff's plant, stated that whether or not the relative location of the fuel tank and drier

would be dangerous depended upon the use of fuel, and that if a low grade fuel oil is used, it is not dangerous, although he stated that he know of no other plant constructed like that of the plaintiff. And the witness Varner on cross-examination would not say that the plant was a fire hazard if the tank did not leak or would not overflow. It also appears that the plaintiff had carried insurance on the plant up to just a short time prior to the fire, but dropped it, perhaps, on account of the high rate. The plant had been run by plaintiff for twelve years without having any fire, which damaged or destroyed the plant. There can, of course, be no doubt that the plant could have been constructed more safely. The fuel tank could have been placed on the outside of the building where there would have been no possibility of any overflow from it coming in contact with the drier, and the gauging-hole or any other hole could have been so covered that there would have been no possibility of the overflowing of the fuel tank. In other words, the plant could have been so constructed that no act in connection with the delivery of fuel oil, no matter how negligent, could have had any detrimental effect. Was plaintiff bound to do so, particularly in view of the fact that the defendant, as well as Millhouse, knew of the manner of the construction of the plant? Counsel for defendant evidently seem to contend that such was the duty of the plaintiff. Their contention, in brief, seems to be, that a person cannot have any fire hazard on his place without being negligent; that he cannot place his property in such a situation that there is a possibility or probability that it will be injured or damaged through the act or negligence of another. We do not think that the authorities go that far. None of the authorities cited by the defendant does so. Counsel call our attention to the comment to Sec. 478 of the Restatement of the Law of Torts, reading as follows:

"* * * When the negligent act of the plaintiff is necessary to make a dangerous situation negligently created by the defendant effective in harm, the plaintiff's negligence is always a contributory factor in producing his harm and as such prevents him from recovery against the negligent defendant. This is also the case when the negligence of the plaintiff and defendant have created forces which are actively operating at the time or substantially at the time that the injury is received. This is so whether the act of the plaintiff which set the force in motion was antecedent or subsequent to the act of the defendant."

Whatever we may think of this statement, it assumes that the plaintiff is actually negligent,—the very fact which is in dispute in this case. Of course, it could not well be contended as an abstract proposition of law that to have a dangerous Bentonite plant on one's premises is negligence per se. Thousands of machine shops contain dangerous instrumentalities. Dynamite and other explosives are kept on premises, and we have no doubt, ordinarily lawfully. And it could hardly be claimed that to negligently destroy such machinery, or negligently set fire to such dynamite or other explosives is excused by the mere fact that these are dangerous instrumentalities or elements. The case before us is not one involving the use of dangerous instrumentalities whereby another has been injured. The solution of the legal problems herein lies in another direction, namely in the cases which deal with exposure of one's premises to the negligence of another. It has been said that to expose oneself or his property to danger is not necessarily negligence. 1 Shearman and Redfield on Negligence, Rev. Ed., p. 249. Contributory negligence does not automatically arise because an accident might have been avoided, but depends on the circumstances and it is usually a question of fact for the jury. Flanigan v. Madison Plaza Grill, Inc., 129 N. J. L. 419, 30 Atl. 2d 38. Quite

a number of cases deal with a situation in which there was exposure of premises to the negligence of others, including exposure to floods, fire and other dangers, and in which it was claimed, as in the case at bar, that plaintiff's property was placed or kept in a dangerous situation or condition which should have been avoided by plaintiff. While we have found no case involving a situation like that in the case at bar, the facts in these cases bear an analogy to those here. The rule is summarized in 45 C. J. 945, Sec. 505, as follows:

" * * * it is generally held that the rule which requires one to exercise ordinary care to protect himself from the results of the negligence of others is subject to the exception that, as a person is entitled to use his own premises for any lawful purpose, his failure to protect them from the negligence of another will not be contributory negligence. But a man has no right to invite peril, or run into danger, even on his own property."

One of the first cases in this country dealing with premises exposed to the negligence of others is Cook v.Champlain Transportation Company, 1 Denio (N. Y.) 91, decided in 1845, in which plaintiff's property, placed close to a river, was destroyed by a negligent fire of a steamboat company. The court stated in part:

"The property destroyed was in an exposed and hazardous position, and therefore in more than ordinary danger from mere accidental fires. This risk the plaintiffs assumed, but not the risk of another's negligence. They were on their own land, and free to use it in any manner and for any purpose which was lawful. * * * * we must at last, I think, come to the conclusion that, while a person confines himself to a lawful employment on his own premises, his position, however injudicious and imprudent it may be, is not therefore wrongful; and that his want of due care or judgment in its selection can never amount to negli-

gence, so as thereby to deprive him of redress for wrongs done to him by others."

In Yik Hon and others v. Spring Valley Water-Works, 65 Cali. 649, 4 P. 666, water negligently escaped from defendant's water main falling on the roof of plaintiff, damaging his drugs below. The defendant set up the defense that plaintiff's roof was not watertight, and that he was, accordingly, guilty of contributory negligence. The contention was overruled. In Holman v. Boston Land & Security Co., 8 Colo. 282, 45 P. 519, the defendant threshed for plaintiff, placing his engine between two stacks close to each other; defendant's fire burned the stacks. He contended that the closeness of the stacks was dangerous and that plaintiff was guilty of contributory negligence. The court, in using language, which with a necessary change, would be quite appropriate in the case at bar, said:

"He undertook the job of threshing, knowing how the stacks were situated, and was bound to conduct the work with reference to their existing situation. As he engaged to operate on them as they were, and not as in his opinion they should have been, their position with reference to each other did not constitute contributory negligence on the part of the plaintiffs, and was no excuse for negligence on the part of the defendant."

In George v. Odenthal, 56 N. D. 229, 225 NW 323, the defendant's fire, when threshing, escaped, burning plaintiff's buildings covered with straw. The court said:

"The defendant further insists that the plaintiff was guilty of contributory negligence, in that it appears that the granaries belonging to him, which were destroyed in the fire, together with their contents, were covered with straw. When the plaintiff threshed, the straw from the separator apparently was blown on and around these granaries. Defendant's contention is that, if this straw had not been thus blown onto the buildings, they would not have burned;

that therefore the plaintiff was guilty of negligence in this respect. It seems to us that there can be no possible merit to this contention. The defendant had the right, if he saw fit, to cover his buildings with straw, and to assume that no one would be so negligent with respect to fire as to cause the straw stacks or anything that they might cover, to be burned."

In North Bend Lumber Co. v. City of Seattle, 116 Wash. 500, 199 P. 998, it was held that it is not contributory negligence for an owner of land to put it to use by constructing buildings thereon, or otherwise improving it, though he has reason to feel that such improvements might be flooded, resulting from the negligent acts of another. The court said in part: improving it, though he has reason to feel that such improvements might be flooded resulting from the negligent acts of another. The court said in part:

"We need not here decide whether one may use and improve his property in total disregard of a danger, resulting from the negligence of some one else, which he knows exists, and which he is morally certain will damage him. There is no evidence showing or tending to show this condition. We hold, however, that one is not bound to use his property in anticipation of a situation arising, which, because of the negligence of some one else, known to or suspected by him, may or may not cause him damage. The use one may make of his property is not to be measured or limited by any such unstable rule as that contended for by appellant. At least, up to the point where one has become morally certain that the negligence of another will injure him he may make any proper and customary use of his property in total disregard of any negligence of that other, whether such negligence be known to him or not. One owns real estate for the use he may make of it. Being the owner, he may make such use of it as he sees fit, so long as he does not injure his neighbor or violate some principle of the doctrine of police regulation. * * * Any other rule would permit one guilty of wrongdoing to deprive another of the right of making any lawful use of his property."

See further Wright v. Brown, 4 Ind. 95, 58 Am. Dec. 622; City of Marion v. Nunn, 292 Ky. 251, 166 SW 2d 298.

Counsel for defendant rely in part on Chicago, etc. Railway Co. v. Cook, 18 Wyo. 43, 102 P. 657, in which it was held that the owner of buggies wrapped in paper, who left them on the right of way of the railroad company close to inflammable material, was guilty of contributory negligence. In that case the plaintiff inexcusably left the buggies on the right of way for five days after they had been unloaded by the railroad company. He was substantially or nearly in the situation of a trespasser, and the rule in such case appears to be that announced in the foregoing case. 51 C. J. 1180, 3 Elliott on Railroads (3d Ed.) 1759. The case is not in point herein. Plaintiff had his plant on his own premises. Counsel by citing the foregoing case have clearly perceived the line of cases in which the rule or principle applicable in this case must be sought. A great many cases deal with the exposure of plaintiff's property to fires negligently caused by a railroad company, and in which contributory negligence was claimed to exist by reason, of inflamable material on the plaintiff's premises. These cases are collected in 51 C. J. 1174, and subsequent pages; Elliott, Railroads, supra, Sec. 1762; 2 Thompson on Negligence, Secs. 2314-2326, 4 Shearman and Redfield on Negligence (Rev. Ed.) Sec. 755, 22 Am. Jur. 630-632. Anno. in 12 L. R. A. (N. S.) 624-631. Some early Illinois cases held that to have inflamable material on one's property would be contributory negligence as matter of law in case property is destroyed by the negligence of a railroad company. These cases apparently are now repudiated. (Note 12 L. R. A. (N. S.) 625, Shearman and Redfield, supra, Sec. 775.) And no cases, seemingly, now go to that extent unless

perchance in a case in which the plaintiff knew of the imminence of the danger. See Brown v. Oregon R. & N. Co., 41 Wash. 688, 84 P. 400. See Baltimore etc. Ry Co. v. Peck, 68 Ind. App. 269, 114 N. E. 475; North Bend Lumber Co. v. Seattle, supra; Haas v. Hines, 150 La. 599, 91 So. 58. Many of the cases hold that it is not contributory negligence as a matter of law to have such inflamable material on one's premises. In 51 C. J. 1177-1178, for example, it is said:

"The owner of land lying near or contiguous to a railroad right of way, in the exercise of his right to use his land in the natural and ordinary way for purposes to which it is suited, is under no duty to remove from his land such combustible material as dry grass, leaves, weeds, stubble, shucks, corn stalks, broom sedge, or brush, or the like, and hence is not chargeable with contributory negligence for failure to do so, although his property may be extremely liable to take fire in case of negligent management of railroad trains."

So, too, it is said in 4 Shearman and Redfield, supra, Sec. 755:

"The occupant of land near or even next to a railroad is not chargeable with contributory negligence, merely by reason of leaving his land in its natural state or making any legitimate use of his property. It makes no difference if, by so doing, his property may be extremely liable to take fire, in the event of the railroad trains being negligently managed."

The use of one's premises in the customary manner in such case means, as held by Thompson on Negligence, supra, Sec. 2321, "as he might lawfully have used it, if the railroad had not been there." In Kalbfleish v. R. R. Co., 102 N. Y. 520, 7 NE 557, 55 Am. Rep. 832, the court held that the exposure of benzine out of doors on plaintiff's premises, close to a railroad was not contributory negligence. In Water's Pierce Oil Co. v. King (Tex. Civil App.), 24 SW 700, the defendant's warehouse containing inflamable oil was

destroyed through defendant's negligence. The court held that the fact that the plaintiff might have constructed the building 30 feet away was no defense, and that the plaintiff was not guilty of contributory negligence, the court stating, "so use your own as not to injure another's is the rule, not so use your own that another shall not injure your property." The rationale of these cases is clearly stated by the Supreme Court of the U. S. in Leroy Fibre Company v. Chicago etc. Ry. Co., 232 U. S. 340, 58 L. Ed. 631, 34 Sup. Ct. 415, in which the court said in part:

"That one's use of his property may be subject to the servitude of the wrongful use by another of his property seems an anomaly. It upsets the presumptions of law, and takes from him the assumption, and the freedom which comes from the assumption, that the other will obey the law, not violate it. It casts upon him the duty of not only using his own property so as not to injure another, but so to use his own property that it may not be injured by the wrongs of another. How far can this subjection be carried? * * * * The question is especially pertinent and immediately shows that the rights of one man in the use of his property cannot be limited by the wrongs of another. The doctrine of contributory negligence is entirely out of place. Depart from the simple requirement of the law, that everyone must use his property so as not to injure others, and you pass to refinements and confusing considerations. There is no embarrassment in the principle even to the operation of a railroad. Such operation is a legitimate use of property; other property in its vicinity may suffer inconveniences and be subject to risks by it, but a risk from wrongful operation is not one of them.

"The legal conception of property is of rights. When you attempt to limit them by wrongs, you venture a solecism. If you declare a right is subject to a wrong, you confound the meaning of both. It is difficult to deal with the opposing contention. There are some principles that have axiomatic character. The tangibility of property is in its uses, and that the uses by

one owner of his property may be limited by the wrongful use of another owner of his is a contradiction."

A number of cases hold that under conditions, similar to those above mentioned, the question of contributory negligence is for the jury. Note 12 L. R. A. (N. S.) 628, 631. In Southern Ry. Co. v. Patterson, 105 Va. 7, 52 SE 694, plaintiff's warehouse was located within a few inches of the defendant's right of way and was used for storing kerosene in barrels. The building was destroyed by a negligent fire of the railroad company. The plaintiff recovered. The court. held that the plaintiff was not guilty of contributory negligence as a matter of law, and that the ultimate extent to which the courts have gone is to leave the question of contributory negligence in such cases to the jury. In Nashville, C. & St. L. Ry. v. Nants, 167 Tenn. 1, 65 SW 2d 189, the court in holding that the question of contributory negligence should have been submitted to the jury stated:

"After the negligence is apparent, and is seen, one may neither fail to exercise ordinary care against contributing to the injury, nor negligently aggravate the damages. * * * * We approve the general rule that an adjoining landowner may make any proper use of his property, free from the obligation of anticipating and guarding against future negligence on the part of the railroad in operation of its trains, but we hold that this rule has no application where an adjoining owner, with knowledge of negligently maintained menacing conditions on the railway right of way, himself is guilty of identical, mutual, concurring, and contemporaneous negligence."

In this case the question of contributory negligence was submitted to the jury, they finding against the defendant. And it is, accordingly, only necessary to determine whether the maintenance of plaintiff's plant was negligence per se. The foregoing authorities

would seem to clearly demonstrate that the mere fact that a man may have a fire hazard on his premises, which he uses lawfully, is not contributory negligence as a matter of law so as to bar recovery by reason of the negligence of another in causing a fire and destroying plaintiff's property. The rule announced in these authorities would seem to be the proper guide in the case at bar. Plaintiff's plant was such as to be exposed to fire through negligence such as that of Millhouse in this case, but was it any more so than property on which a man keeps benzine or kerosene or other like property? It would hardly seem so. At best it could only be said that the difference is one of degree, not of kind, and, as already indicated, to hold that the plaintiff was guilty as a matter of law would be equivalent to hold that the plaintiff was bound to so construct its plant as to be immune from any detrimental act of defendant, no matter how negligent that might be. We are not prepared to go to that length. So far as the record indicates the jury were justified in finding that there would have been no danger of any fire whatever if the defendant had not been negligent. It may have been imprudent for plaintiff to construct its plant in the manner it did, but it was not unlawful and the authorities hold that a person may make any lawful use of his property as he deems best. Furthermore, the witnesses Amberson, and Eyrcik, testifying for plaintiff and who should be better equipped to know the truth than the members of this Court, and whom the jury were authorized to believe, expressed it as their opinion that there was nothing inherently dangerous in the construction of plaintiff's plant. The negligence of Millhouse could not well be said to have been apparent, for plaintiff had used the plant for many years without destruction or damage of its plant by fire, and, moreover, the plaintiff was not bound to

anticipate the negligence of the defendant. 38 Am. Jur. 871; Shearman and Redfield, supra, Sec. 11. Hence, too, in the language of the Supreme Court of Washington, no moral certainty that the negligence of the defendant would injure it could well be attributed to plaintiff. Though Millhouse had been negligent once before, plaintiff was not bound to anticipate that he would be negligent a second time, let alone that he would bring fuel oil with a dangerous content of gasoline. Blount Decker L. Co. v. Martin (Tex. Civ. App.) 190 SW 232. The ordinary man would have expected that he would have been more careful after once causing the plaintiff much trouble in cleaning the floors of the oil which he had spilled. As already noted, some of the cases state the rule to be that a man has the right to use his premises in the customary manner. Thompson on Negligence, as stated, construes this to mean that a man may use his premises in any lawful manner. In any event, so far as the record indicates, there is no standard or customary method of equipping a bentonite plant. These plants seem to be of comparatively recent origin. All seem to be different from the others. So after a most careful examination of the record before us, and the authorities applicable thereto, we cannot say that the plaintiff was guilty of contributory negligence as a matter of law. See Loney v. Laramie Auto Co., 36 Wyo. 339, 255 P. 350; 53 A. L. R. 73; Hines v. Sweeney, 28 Wyo. 57, 201 P. 165, 170, 1018. Northwest States Utilities Company v. Ashton, 51 Wyo. 132, 65 P. 2d 235, 240.

IV. JURISDICTION.

The action herein was brought in Weston County, where the defendant resides, and service was had upon defendant in that County. After the issues were made up, the plaintiff filed a motion, supported by

affidavits, for a change of venue. The court granted the change, sending the case to Crook County, the order reciting that both parties agreed to the change. The Clerk of Court of Weston County, instead of sending the original pleadings in the case to Crook County, sent certified copies. The case was tried, and no objection to the jurisdiction of the District Court of Crook County was made until now. Defendant now claims that the District Court of that County had no jurisdiction of the case, under the provisions of Section 89-1109, Rev. St. 1931, providing as follows:

"The jurisdiction of the court to which the change is directed is complete upon the filing of original papers and transcript in the clerk's office in that court, and the cause must be docketed and stand for trial as if it had originated in that court."

Counsel cite us, among other authorities to Central Bank of Georgia v. Gibson, 11 Ga. 483. In that case, the director of the bank, sued in a county other than its residence, waived jurisdiction and pleaded to the merits. This the court held could not be done, under a constitutional provision that a case shall be tried in the county where the defendant resides. We are also cited to Nixon and Danforth v. Mutual Insurance Company, 74 S. C. 438, 54 SE 657. In that state the statute provided that a case shall be tried in the county where the defendant resides. It was held that this relates to jurisdiction of the subject matter, and that the case cannot be tried in any other county. These cases are distinguishable from the case at bar. Section 89-705, Rev. St. 1931, provides that a corporation may be sued in the county in which it is situated. That was done in this case. The statute does not forbid the trial in any other county to which a change of venue has been properly taken. It is true that Section 89-1109 Rev. St. 1931, provides that the jurisdiction of the county to which the venue has been changed is

complete upon the filing of the original papers. In the recent case of Myuskovich v. State (Wyo.), 141 P. 2d 540, we discussed Section 20-433 Rev. St. 1931, reading that "jurisdiction over proceedings to compel support is vested in the district court of the county in which the alleged father is permanently or temporarily resident" etc. We held that the jurisdiction here mentioned did not relate to the subject matter; that statutes relating to venue are procedural merely, and may be waived. The jurisdiction in the case at bar relates to the pleadings filed in a particular court. If the pleadings had been lost, copies, including the certified copies of the Clerk of Weston County, could have been substituted. 49 C. J. 658. No jurisdiction of the subject matter would be involved in such case. Neither do we think it is involved in the case at bar, and that the defendant by going to trial waived the fact that the original pleadings were not sent to Crook County. A case direct in point is Granger v. Warrington, 8 Ill. 299, 305, where the court said:

"The first asignment questions the correctness of the decision below, in refusing to dismiss the cause in Du Page, for the reason that the original papers had not been transmitted by the clerk of the Cook Circuit Court to the Du Page Court. The statute relative to a change of venue requires that the clerk shall transmit all papers filed in the cause and appertaining or forming part of the record. But can a party who has obtained a change of venue, taken several steps in the cause, consented to a continuance, and at a subsequent term went to trial without objection, make this motion? We think not. The declaration and other pleadings and proceedings in the cause must have been before the Du Page Court in some form, as all the proceedings of the Cook Court have been sent up in the record. If only copies were transmitted by the clerk to Cook to Du Page, it only amounted to an irregularity, which was waived by the defendant below appearing in Du Page and consenting

to a continuance, and subsequently to a trial without objection."

See also Burrell v. State, 129 Ind. 200.

V. INSTRUCTION ON INSURANCE.

The defendant asked the Court, which was declined, to give the following instruction to the jury, namely:

"You are instructed that the Court permitted you to be examined by counsel concerning your interest in any insurance company; that such examination was permitted only and solely for the purpose of determining whether or not you had such interest. No insurance company is a party in this suit. The question whether or not the defendant carried insurance is not in this case and you must not consider that question in any manner in reaching your verdict."

The record contains no testimony or indication on the question of insurance by the defendant and, hence, the instruction, if given, would not have had any basis therein. Neither are the questions asked the jury in the record. We need not decide whether the instruction would have been proper if anythnig in the record would indicate that the jury were given to under-stand that the defendant carried insurance to cover a situation such as is before us. So far as we can tell the instruction would have been harmful rather than helpful to the defendant since it called specific attention to the point. It might have given the jury to understand that the defendant was fully protected. We do not think that under the circumstances it was prejudicial error not to give it.

Finding no reversible error in the record, the judgment of the trial court should be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, C. J., and RINER, J., concur.